IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Philadelphia County Department  :   SEALED CASE
of Human Services,               :
                Petitioner  :
                             :
     v.                  :
                             :
Department of Human Services,    :   No. 671 C.D. 2024
                Respondent  :   Submitted: July 7, 2025


BEFORE:   HONORABLE ANNE E. COVEY, Judge
              HONORABLE LORI A. DUMAS, Judge
              HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                      FILED:  October 17, 2025


      The Philadelphia County Department of Human Services (DHS) petitions this Court for review of the Department of Human Services (Department), Bureau of Hearings and Appeals' (BHA) April 29, 2024 order adopting the Administrative Law Judge's (ALJ) Recommendation that sustained M.S.-G.'s request to amend her child abuse report on the ChildLine and Abuse Registry

(ChildLine)[1] from founded to indicated.[2]  Essentially, DHS presents one issue for this Court's review: whether the BHA erred by concluding that DHS did not satisfy its burden of proof and, as a result, recommended that DHS and the Department amend the status of M.S.-G.'s child abuse report to an indicated status.[3] After review, this Court affirms.

---

[1] Section 3490.4 of the Department's Regulations defines *ChildLine* as

> [a]n organizational unit of the Department which operates a [s]tatewide toll-free system for receiving reports of suspected child abuse established under [S]ection 6332 of the [Child Protective Services Law [(CPSL)], 23 Pa.C.S. § 6332] (relating to establishment of [s]tatewide toll-free telephone number), refers the reports for investigation and maintains the reports in the appropriate file.

55 Pa. Code § 3490.4.

[2] A *founded report* is defined in Section 3490.4 of the Department's Regulations as

> [a] child abuse report made under the CPSL and this chapter if there has been any judicial adjudication based on a finding that a child who is a subject of the report has been abused, including the entry of a plea of guilty or nolo contenderee [sic] or a finding of guilt to a criminal charge involving the same factual circumstances involved in the allegation of child abuse.

55 Pa. Code § 3490.4  An *indicated report* is defined therein as

> [a] child abuse report made under the CPSL and this chapter if an investigation by the county agency or the Department determines that substantial evidence of the alleged abuse exists based on any of the following:
>
> > (i) Available medical evidence.
> >
> > (ii) The child protective service investigation.
> >
> > (iii) An admission of the acts of abuse by the perpetrator.

*Id.*

[3] In its Statement of Questions Presented, DHS presented three issues for this Court's review: (1) whether the BHA erred by issuing an adjudication that lacks the findings necessary to support the adjudication in accordance with Section 507 of the Administrative Agency Law, 2 Pa.C.S. § 507; (2) whether the BHA impermissibly reviewed the Protection from Abuse (PFA) order for error when it considered whether the PFA Judge was aware of unidentified discrepancies in the witness' statements in the various proceedings; and (3) whether the BHA incorrectly found

On September 15, 2022, DHS received a referral report of child abuse against M.S.-G., child's mother. On October 24, 2022, DHS filed an indicated report of child abuse against M.S.-G. On November 1, 2022, ChildLine informed M.S.-G. that her name would be listed as a perpetrator on an indicated report of child abuse. On November 10, 2022, ChildLine received M.S.-G.'s request for a hearing to expunge the indicated report. The BHA held a hearing on April 5, 2023.

On June 22, 2023, before the BHA ruled on the expunction, a Protection from Abuse (PFA) judge (PFA Judge) entered a PFA order against M.S.-G. stating:

> The evidence is not sufficient for me to enter an order of protection on either side;[4] so, I'm going to vacate the temporary orders and the petition[s] will be dismissed. Regarding the petition filed on behalf of [the child], the concern is really just the September 15th incident. There were other concerning behaviors, but what happened during that incident was very distressing, inappropriate.
>
> **The child was put at risk and he was injured**. So, I am going to enter an order on his behalf. It's an order for protection only. That does not prohibit you from seeing your child.

---

that the PFA order did not involve the same factual circumstances where the final PFA order was predicated on the same incident and abuse as the allegations of abuse in the founded report and the trial court found that the abuse occurred. *See* DHS Br. at 4. These issues are subsumed in the issue as rephrased by this Court and will be addressed accordingly.

[4] The PFA Judge conducted a hearing on three PFA petitions:

> The first was filed by [father, G.G.] against [M.S.-G.]. A temporary full order was put into place on September 2[nd] of 2022.
>
> **The second was filed by** [**G.G.,**] **on behalf of** [**child**, **L.G.**], date of birth October 14[th] of 2021, **against** [**M.S.-G.**] A temporary full order was put into place on September 16[th] of 2022, and that order was modified on January 17[th] of 2023.
>
> The third petition was filed by [M.S.-G.] against [G.G]. A temporary full order was put into place on September 16th of 2022.

Reproduced Record at 66a (emphasis added).

3

> It just says that he can't be harmed. That order is going to be in place for one year. It's also going to specify that no one shall smoke marijuana around this child under any circumstances, regardless of location.

Reproduced Record (R.R.) at 59a (emphasis added).

On June 27, 2023, DHS informed the BHA that it had filed a CY-49[5] to change the status of the child abuse report from indicated to founded based upon a final PFA order involving M.S.-G. and the subject child, L.G. On August 15, 2023, the BHA received a founded CY-48[6] for M.S.-G. regarding the allegation of child abuse, from which M.S.-G. appealed at the April 5, 2023 hearing. On August 24, 2023, the BHA mailed a Hearing Scheduling Order to the parties, scheduling a hearing before an ALJ on M.S.-G.'s appeal for October 23, 2023.

After multiple continuances, the BHA held an administrative hearing on February 8, 2024. Thereafter, the ALJ issued a recommendation that the Department amend M.S.-G.'s report of child abuse from founded to indicated. The ALJ explained:

> While the court documentation submitted by DHS details the allegations of child abuse involving [M.S.-G.] and the subject child, [L.G.,] there are discrepancies in the testimony of the subject child's father[, G.G.,] and [the] nanny [(Nanny)] that was given at the April 5, 2023[] hearing on the indicated report and at the June 20 and 21, 2023 PFA hearing. It should be noted that these discrepancies in the testimonies of [G.G.] and [N]anny were not brought up at the June 20 and 21, 2023 hearing dates. There were also statements made by [G.G.] in his [p]etition for a PFA that are significantly different than his testimony at the April 5, 2023[] hearing on the indicated report. . . . In order to sustain a founded report, a [PFA] adjudication [must] find[] that the child abuse occurred. In this matter, the June 21, 2023 PFA transcript shows that the [PFA] Judge [] granted the PFA noting that, "regarding

---

[5] A CY-49 is the child protective services supplemental report. *See* R.R. at 12a-14a.
[6] A CY-48 is the child protective services investigation report. *See* R.R. at 20a-22a.

the petition filed on behalf of L.G., the concern is just the September 15th incident. There were other concerning behaviors, but what happened during that incident was very distressing, very inappropriate. [L.G.] was put at risk and he was injured. So I'm going to grant an order on his behalf." While DHS makes the argument that the language of [the PFA] Judge [] in this order meets the [sic] [PFA] adjudication finds that the child abuse occurred requirement under [Section 6303 of the [CPSL], 23 Pa.C.S. § 6303], [the PFA] Judge['s] [] statements do not constitute a specific finding of child abuse as required by the statute.

ALJ Adj. at 9 (italics and internal record citation omitted). On April 29, 2024, the BHA adopted the ALJ's Recommendation in its entirety. On May 29, 2024, DHS appealed to this Court.[7]

DHS argues that the BHA erred by finding that the final PFA order did not support the founded report. The Department rejoins that DHS failed to establish that the PFA order demonstrates that the victim child was abused. Rather, the Department retorts that the PFA order establishes that the child was put at risk and injured, but does not specifically find M.S.-G. committed child abuse. Moreover, the Department asserts that the testimony from the June and April 2023 hearings does not align but, instead, creates more disparity as to the facts of how the child was injured.

Initially, Section 6303(a) of the CPSL defines a *founded report*, in relevant part, as

[a] child abuse report involving a perpetrator that is made pursuant to [the CPSL], if any of the following applies:

---

[7] This Court's "review is limited to determining whether an error of law was committed, whether constitutional rights were violated, or whether the necessary findings of fact are supported by substantial evidence." *R.L. v. Dep't of Hum. Servs.*, 236 A.3d 1183, 1186 n.4 (Pa. Cmwlth. 2020) (citation omitted); *see also* Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

5

. . . .

(4) A final [PFA] order has been granted under [S]ection 6108 [of the PFA Act, 23 Pa.C.S. § 6108] (relating to relief), when the child who is a subject of the report is one of the individuals protected under the [PFA] order and:

(i) only one individual is charged with the abuse in the [PFA] action;

(ii) only that individual defends against the charge;

(iii) **the adjudication involves the same factual circumstances involved in the allegation of child abuse**; and

(iv) **the protection from abuse adjudication finds that the child abuse occurred**.

23 Pa.C.S. § 6303(a) (emphasis added).

This Court has explained:

For a report to be given the status of "founded[,]"[] there must be a judicial adjudication and the judicial adjudication must involve "the same factual circumstances involved in the allegation of child abuse." 23 Pa.C.S. § 6303. Once DHS has demonstrated that the factual circumstances of the judicial adjudication and the report are the same, the report becomes a "founded" report.

*D.M. v. Dep't of Pub. Welfare*, 122 A.3d 1151, 1155 (Pa. Cmwlth. 2015) (footnote omitted).

Moreover,

for an indicated report to be independently "founded," **the adjudication must resolve all of the issues in the indicated report definitively and conclusively**. It is for this reason that this Court, while highlighting that an adjudication cannot *usually* be collaterally attacked in an administrative proceeding, has stated that the only way to properly challenge an adjudication upon which a founded report is based is to appeal and contest the adjudication.

6

*C.F., IV v. Dep't of Hum. Servs.*, 174 A.3d 683, 692 (Pa. Cmwlth. 2017) (bold and italic emphasis added).

Here, the CY-48, the April 5, 2023 expunction hearing transcript, the Petition for PFA on behalf of L.G. (Petition for PFA), and the June 20 and 21, 2023 PFA hearing transcripts were entered into evidence and made a part of the record. The CY-48 provided, in relevant part:

> **[M.S.-G.] attempted to take [L.G.] from Nanny via force**. **During** [sic] **tussle [M.S.-G.] unbuckled [L.G.] from car seat**, **unbuckled car seat**[,] **and yanked car seat out of car causing [L.G.] to fall out of the car seat and fall face first on pavement**. [G.G.] was not present when the incident between [M.S.-G.] and Nanny first began but arrived later. **When [G.G.] arrived**, **he was able to see [L.G.] fall to the ground from down the street**. [G.G.] and Nanny provided similar accounts of the incident. [M.S.-G.'s] statement had inconsistencies.

R.R. at 21a (emphasis added). However, in the Petition for PFA, G.G. described:

> September[] 15[,] 2022[,] [L.G.] was in [] [N]anny's car coming back to the house. [M.S.-G.] ambushed the car about five blocks from the house. [] [N]anny questioned why she did this and [**M.S.-G.**] **came and opened the car door and threw** [**L.G.**] **onto the street**. He has a mark on his head and scratches on his face. She bit [] [N]anny. I got a call from [] [N]anny and I called the police. **When I got there** [**M.S.-G.**] **was dragging** [**L.G.**] **down the street**. The police came and made [M.S.-G.] give me the baby. The police told me to file a PFA. DC#22-05-013938[.] I took [L.G.] to [Children's Hospital of Philadelphia (CHOP)] and DHS was notified by the social worker.[8]

---

[8] In response to whether M.S.-G. committed any prior acts of abuse, G.G. reported:

> [G.G.] is filing on behalf of minor son[, L.G.] against [] [M.S.-G].
> [G.G.] feels [M.S.-G.] is rough with [L.G.] and holds him like he is
> a football and mishandles [L.G]. [M.S.-G.] abuses marijuana in

7

R.R. at 125a (capitalization omitted; emphasis added).

At the April 5, 2023 expunction hearing, G.G. testified, in relevant part:

Q. What did you see once you got to [the specified location on September 15, 2022]?

A. I got out of my car. There were two other cars there. [] [N]anny's car and the car that my wife drives that I was leasing, and there was something going on in the backseat of [] [N]anny's car. **My vision was partially obscured** by the car, at least by [] [N]anny's car, and I think by [M.S.-G.'s] car as I was trying to get out of my car. **There was something going on in the backseat of** [] **[N]anny's car**.

Q. Do where [sic] [L.G.] was at that time?

A. He was in the backseat of [] [N]anny's car with [] [N]anny.

. . . .

Q. Was he in a car seat, at that point?

A. **I couldn't see inside the car**, but I just saw that [] [N]anny was on one side, [M.S.-G.] was on the other side, and there was something going on. What I did is I tried to get into [M.S.-G.'s] car to sit in the driver's seat because I was afraid that she would drive off before the police could get there.

Q. What happened when you were seated in [M.S.-G.'s] car?

A. [M.S.-G.] brought [L.G.] over to the passenger side of the car.

R.R. at 164a-165a (emphasis added).

---

front of [L.G]. [M.S.-G.] drinks alcohol. [M.S.-G.] may suffer from mental illness. [G.G.] feels [M.S.-G.] is a danger to [L.G].

R.R. at 125a (capitalization omitted).

G.G. continued:

Q. At any point during the incident that took place with [M.S.-G.], was [L.G.] removed at any point or did he appear to fall at any point during the incident?

A. He was on the road. **I was blocked by the perspective of the car as to how that happened between - [] [N]anny was in the backseat with [M.S.-G.],** you know, and after **I saw [M.S.-G.] pick [L.G.] up off the ground and bring them** [sic] **towards her car**.

R.R. at 167a-168a (emphasis added).

However, at the June 21, 2023 PFA hearing, G.G. related:

Q. Okay. And what, if anything, happened on September 15, 2022, that brings you to court today?

A. **That's when the incident occurred where [M.S.-G.] threw [L.G.] out of the car** and he got this huge welt on his head, and I had to take - I involved the police, and I had to take him to CHOP, where we stayed the entire night.

. . . .

Q. Okay. And what happened? Did you -- did you eventually arrive at that location . . . ?

A. I did.

Q. Okay. And what, if anything, you see [sic] when you arrived there?

A. Well, as I was pulling up, I could see there was a struggle going on in [Nanny's] car. [Nanny] had, like, a Nissan, and her son [] was there, and he's about seven. And [Nanny] had [L.G.] in a car seat, and [M.S.-G.] was - it looked to me like she was pulling the car seat out of the door, and that [Nanny] was on the other side, and it appeared to me she was trying to keep [M.S.-G.] from taking [L.G.] in the car seat.

Q. And where was [L.G.] at this point?

9

A. As I pulled up, **I saw [L.G.] and the car seat fly out of the car to [M.S.-G.'s] side**, **with [L.G.] falling out of the car seat**, **and he was on the ground** and he had this huge, like, welt, knot, and some road -- what do they call that, road turf or road scrape -- on his cheek. And he's crying hysterically, and [] [N]anny is getting -- coming around the car.

R.R. at 80a (emphasis added).

At the April 5, 2023 expunction hearing, Nanny described, in relevant part:

Q. Do you recall an incident that took place involving [L.G.] and [M.S.-G.] on September 15th, of 2022?

A. Yes.

. . . .

Q. What happened that day when [M.S.-G.] approached your vehicle with [L.G.]?

A. So, we pulled over and [M.S.-G.] got out [sic] the car, and she kind of just, like, tried to get him out [sic] the back seat. And I guess, like, just throw them in her car. But, you know, I got out [sic] the car really quickly, and I, like, grabbed the car seat because I'm like, you can't do that. . . .

Q. Do you recall if there's any type of physical contact or struggle between you and [M.S.-G.] at the time?

A. Yeah, I was, you know, just trying to take the car seat back. And she, you know, tried to take him off the car seat and stuff like that, just to get him. **And as she unstrapped him and we were pulling and tugging**, **he fell on the floor**.

. . . .

Q. What happened with [L.G.] after he fell on the floor - or fell on the pa[ve]ment?

A. When we were tugging, I believe that's when I called his dad. So, we were literally only like, a block or two

10

away from the house. So, he came like, you know, pretty quickly. So, when he fell on the floor, I believe I grabbed him. . . .

Certified Record (C.R.) at 189-191 (emphasis added).

However, at the June 21, 2023 PFA hearing, Nanny related:

Q. So, what happened [on September 15, 2022], when you see [sic] [M.S.-G.]?

A. She hurry [sic] up and gets out [sic] the car, she yanks my door open. At this time, I'm trying to get out.

Q. Which door?

A. [L.G.'s] door, because, of course, he is on - in the backseat, on the right-hand side. I'm on the left-hand side.

Q. Okay.

A. So, I'm trying to get out the door. By that time, she already unbuckled the seatbelt, because it's supposed to go around him.

. . . .

A. So, by that time that she unbuckles the seatbelt, she has him halfway out of the car and I'm trying to pull the [car seat]. Like, we're kind of tugging or whatever the case may be. I kind of pushed her and I'm like, "[M.S.-G.], why are you doing this? You know that you're not supposed to be doing this."

C.R. at 97 (emphasis added).

Nanny continued:

And we're tugging, tugging, tugging, and I'm like, "[M.S.-G.], let go." **And she pulls it so hard that he falls out of the car seat**. After that, she picks--

Q. Where does -- where does he fall?

A. -- he falls on the ground -- concrete.

Q. And what part of his head or -- I'm sorry, what --

11

A. I see him --

Q. -- part of his body?

A. -- face down first.

Q. Okay. And what's he doing at this time?

A. He's crying.

*Id*. (emphasis added).

DHS argues that the BHA erred by issuing an adjudication that lacks the findings necessary to support the adjudication in accordance with Section 507 of the Administrative Agency Law (Law), 2 Pa.C.S. § 507 (relating to contents and service of adjudications). DHS cites *In re Petition for Formation of Independent School District*, 962 A.2d 24 (Pa. Cmwlth. 2008), to support its position.

In *Independent School District*, the Secretary of Education (Secretary) issued an adjudication denying a petition seeking to transfer all school-related services from one school district to another school district after determining the petition lacked merit. Therein, the Secretary reviewed the materials submitted and found that the information submitted failed to establish that the transfer had merit. This Court found that the Secretary's findings did not comply with Section 507 of the Law, holding:

> [T]he Secretary's findings reveal nothing about the information submitted, i.e., what the Secretary believed and considered[,] and what the Secretary did not believe or consider. Absent any specific findings regarding the evidence, it is impossible for this [C]ourt to conduct appellate review of the Secretary's adjudication.

*Indep. Sch. Dist.*, 962 A.2d at 28.

Here, the ALJ explained, in relevant part:

> While the court documentation submitted by DHS details the allegations of child abuse involving [M.S.-G.] and the subject child, **there are discrepancies in the testimony**

12

**of the subject child's father[, G.G.,] and [N]anny that was given at the April 5, 2023[] hearing on the indicated report and at the June 20 and 21, 2023 PFA hearing**. It should be noted that these discrepancies in the testimonies of the subject child's father[, G.G.,] and [N]anny were not brought up at the June 20 and 21, 2023 hearing dates. **There were also statements made by the subject child's father in his Petition for [] PFA that are significantly different than his testimony at the April 5, 2023[] hearing on the indicated report**. . . . In order to sustain a founded report, a [PFA] adjudication [must] find[] that the child abuse occurred. In this matter, the June 21, 2023 PFA transcript shows that **the [PFA] Judge [] granted the PFA noting that**, "regarding the petition filed on behalf of L.G., the concern is just the September 15th incident. There were other concerning behaviors, but what happened during that incident was very distressing, very inappropriate. **The child was put at risk and he was injured**. So I'm going to grant an order on his behalf." While DHS makes the argument that the language of [the PFA] Judge [] in this order meets [sic] the [PFA] adjudication finds that the child abuse occurred requirement under [Section 6303 of the CPSL], [**the PFA] Judge['s] [] statements do not constitute a specific finding of child abuse as required by the statute**.

ALJ Adj. at 9 (emphasis added; internal citation omitted).

A review of the record evidence, including, *inter alia*, the CY-48, the April 5, 2023 expunction hearing transcript, the Petition for PFA, and the June 20 and 21, 2023 PFA hearing transcripts, leaves no doubt what the ALJ considered, and why the ALJ concluded that DHS did not satisfy its burden of proof. Given the above-stated discrepancies, the ALJ determined that "the factual circumstances of the judicial adjudication and the report [were not] the same." *D.M.*, 122 A.3d at 1155. While both involved the September 15, 2022 incident, the testimony supporting the indicated child abuse report and the final PFA order were not the same. Accordingly, the BHA's adjudication did not lack the necessary findings to support the adjudication in accordance with Section 507 of the Law.

13

DHS next argues that the BHA impermissibly reviewed the PFA order for error when it considered whether the PFA Judge was aware of unidentified discrepancies in the witness' statements in the various proceedings. DHS cites *J.F. v. Department of Human Services*, 245 A.3d 658 (Pa. 2021), to support its position.

The *J.F.* Court explained:

> **Where the founded report reflects a judicial adjudication that is "based on a finding that a child who is a subject of the report has been abused" per Section 6303 of the CPSL**, **as in a** criminal, juvenile delinquency, juvenile dependency, or [**PFA**] **matter, the contest is relatively straightforward**: the court provides the opportunity for an evidentiary hearing, on a record, in which the named perpetrator may present a case, cross-examine witnesses, challenge evidence, and make arguments to attack the merits of the child abuse report, and the final outcome may be appealed to a higher court. In assessing the validity of the founded report in relation to Section 504 of the [] Law, these features of judicial review demonstrate the statute's requisite elements, *i.e.*, "reasonable notice[,]" "an opportunity to be heard[,]" and "a full and complete [stenographically recorded] record[.]" 2 Pa.C.S. § 504.

*J.F.*, 245 A.3d at 673 (emphasis added).

However, here, the founded report relied on a PFA order based on *different facts* than those presented relative to M.S.-G.'s indicated report. The BHA did not review the PFA order for error. Rather, the ALJ reviewed the PFA order to determine whether "the factual circumstances of the judicial adjudication and the report [were] the same[,]" as he was required to do. *D.M.*, 122 A.3d at 1155. The ALJ concluded that they were not. Accordingly, the BHA did not impermissibly review the PFA order for error.

Finally, DHS argues that the BHA incorrectly found that the PFA order did not involve the same factual circumstances, where the final PFA order was

14

predicated on the same incident and abuse as the allegations of abuse in the founded report and the PFA Judge found that the abuse occurred.

As stated above: "[F]or an indicated report to be independently 'founded,' the adjudication must resolve all of the issues **in the indicated report** definitively and conclusively." *C.F., IV*, 174 A.3d at 692 (emphasis added). First, the PFA Judge's statement: "The child was put at risk and he was injured[,]" R.R. at 59a, is not a definitive and conclusive finding that **M.S.-G. committed child abuse against L.G**. as Section 6303(a)(4)(iv) of the CPSL requires. This conclusion is further supported by the fact that G.G.'s Petition for PFA on behalf of L.G. against M.S.-G. was not the only petition before the PFA Judge at the PFA hearing. G.G. and M.S.-G. filed cross-petitions for PFAs, which the PFA Judge ruled upon in the same proceeding.

Second, given the different factual scenarios presented relative to the indicated report and the PFA order, the PFA adjudication clearly did not "resolve all of the issues in the indicated report **definitively and conclusively**[,]" *C.F., IV*, 174 A.3d at 692 (emphasis added), as "th[at] adjudication [did not] involve[] the same factual circumstances involved in the allegation of child abuse[,]" as required by Section 6303(a)(4)(iii) of the CPSL. For example, G.G. testified at the April 5, 2023 expunction hearing that his vision was blocked and all he could see was M.S.-G. pick L.G. up off the ground after the incident occurred. However, at the June 21, 2023 hearing, G.G. related that he saw L.G. and the car seat fly out of the car to M.S.-G.'s side, with L.G. falling out of the car seat, and L.G. landing on the ground. Further, at the April 5, 2023 expunction hearing, Nanny described that as M.S.-G. unstrapped L.G. and they were pulling and tugging on the car seat, L.G. fell on the ground. However, at the June 21, 2023 hearing, Nanny recounted that M.S.-G. pulled the car seat so hard that L.G. fell out of the car seat. Consequently, the ALJ properly ruled that the PFA order did not involve the same factual circumstances

15

because both were based on the presentation of different factual scenarios and the PFA Judge did not definitively and conclusively make a finding that M.S.-G. committed child abuse against L.G. Accordingly, the BHA properly determined that the final PFA order did not support the founded report.

For all of the above reasons, the BHA's order is affirmed.


_____
ANNE E. COVEY, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Philadelphia County Department of Human Services, | : | SEALED CASE |
| Petitioner | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| Department of Human Services, | : | No. 671 C.D. 2024 |
| Respondent | : | |

## O R D E R

AND NOW, this 17th day of October, 2025, the Department of Human Services, Bureau of Hearings and Appeals' April 29, 2024 order is affirmed.

_____

ANNE E. COVEY, Judge